IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

BERNARD LEROY MACCARLIE,

        Petitioner,                 No. CIV S-00-1830 LKK CHS P

      vs.

GAIL LEWIS,

        Respondent.             FINDINGS AND RECOMMENDATIONS

_____/

## I.   **INTRODUCTION**

Petitioner, Bernard MacCarlie, represented by counsel, is proceeding upon his second amended petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, attacking his convictions for conspiracy to commit first degree murder, mayhem, assault with a deadly weapon, and two counts of kidnaping.  The jury hung as to a charge of murder and acquitted MacCarlie of robbery.  On January 20, 1995, MacCarlie was sentenced to an indeterminate term of 26 years to life, plus a consecutive term of 13 years.

/////

/////

1

## II.   CLAIMS

MacCarlie's second amended petition raises six claims as follow, verbatim:

A.   The court's instruction regarding the need for the jury to find an intent to kill to convict on the conspiracy charge deprived MacCarlie of due process and his sixth amendment right to jury trial.

B.   MacCarlie's conviction for conspiracy to commit murder violated due process and the prohibition on ex post facto laws because he was retroactively deprived of instructions on the lesser included offenses of conspiracy to commit second degree murder or manslaughter–and thus of those defenses to conspiracy to commit first degree murder–by a California Supreme Court decision which postdated the offense and which held conspiracy to commit second degree murder or manslaughter does not exist.

C.   MacCarlie received ineffective assistance of counsel in violation of the sixth amendment when counsel failed to request that the trial court give instructions on conspiracy to commit second degree murder and manslaughter.

D.   MacCarlie's conviction for conspiracy to commit murder violates due process and the prohibition on ex post facto laws because the state court of appeal used Cortez as a basis to reject MacCarlie's contention on appeal that the trial court erred in refusing to instruct the jury on "heat of passion."

E.   MacCarlie has been deprived of federal constitutional due process, his right to trial by jury, and his right to proof beyond a reasonable doubt, because he was not afforded his state law entitlement to juror unanimity on the conspiracy count.

F.   MacCarlie's right to due process under the fifth and fourteenth amendments to the federal constitution was violated by cumulative error and prejudice.

/////

Upon careful consideration of the record and the applicable law, the undersigned will recommend this petition for habeas corpus relief be denied.

## III.   FACTUAL AND PROCEDURAL BACKGROUND

### A.   Facts

MacCarlie was tried jointly with Robert Bond and Leafe Dodds, in the second of three trials involving nine individuals entangled in a ghastly parody of rural

2

neighborliness in a sparsely populated area.  Nine individuals were charged in the

bludgeoning and hacking death of Gary "Hop" Summar, who had lived among them.

The events resulting in the murder occurred during late September and

early October of 1991.  One would surmise that the tale would be short, but its telling

consumed thirteen pages of the opinion of the California Court of Appeal for the First

Appellate District in the consolidated appeals from two of the three trials, including

MacCarlie's.  In this habeas corpus proceeding, MacCarlie's counsel expended some

seven pages in a shortened version, omitting the more sordid details of the lives of the

folks of Hawkins Bar.  The respondent state, having none of that, related the entire story

in forty nine pages of sad particulars.  This Report will summarize the essential

information necessary to understand the facts, then present the claims, the facts

actually heard by MacCarlie's jury, followed by the applicable law and recommended

resolution.

By "essential information necessary to understand the facts," is meant

general information not otherwise collected in one place in the voluminous files of the

five related cases pending in this Court, which does not appear to be contested by the

parties, and will inform the testimony presented by inarticulate witnesses heard by

MacCarlie's jury.

**1)**     **The Place**

The circumstances surrounding the death of Hop Summar took place in

and around tiny Hawkins Bar.  The events related by the witnesses are extremely

difficult to follow without an understanding of the area.  Indeed, both juries involved in

the Bond/MacCarlie/Dodds trial (Bond had a separate jury from MacCarlie and Dodds)

were taken to Hawkins Bar to view the scene.

In view of the personal detail related in the course of these cases, one

recalls C.H. Spurgeon's description of a village as "a hive of glass, where nothing

3

1   unobserved can pass."  The little hamlet sits on State Highway 299.  There are several

2   small communities along the Highway as it runs through Trinity National Forest.  One of

3   the communities is Willow Creek, about ten to fifteen miles west of Hawkins Bar.  Next,

4   is Salyer, some five miles west of Hawkins Bar, and the next is Hawkins Bar itself, at the

5   site of the gravel river crossing (bar) for which it is named.  It includes a general store

6   with a delicatessen and BP gas pumps, and Simon Legree's Bar, located just across the

7   highway from the store.  At the time of the events of this case, the Ironsides Trailer Park

8   was next to the general store.  About a mile east of Hawkins Bar is Gray's Flat.

9          There is a United States Forest Service (USFS) Hawkins Bar Campground

10  (Campground) on the Trinity River, below the Highway, accessed by a steep USFS

11  access road leading from the Highway down to the Campground.  Just east of Hawkins

12  Bar is the turnoff for Waterman Ridge, a logging artery, with smaller roads and spurs

13  along its length.  Hop Summar's body was found at the end of one of the spurs.

14         Although some of the residents of Hawkins Bar had reasonably stable

15  employment, many of them, including at least most of the persons important to this

16  case, spent a great deal if not all of their time and money on drugs, alcohol and

17  carousing, usually at the Campground.

18  /////

19         **2)     The Population**

20         **Gary "Hop" Summar**, the victim, was physically frail and disabled.  His

21  nickname "Hop" derived from his severe limp, the result of multiple childhood surgeries

22  to his back, hip, ankle and foot.  For a while he lived with petitioner Bernard "Bird"

23  MacCarlie, in MacCarlie's trailer, at the Ironsides Trailer Park, paying him rent.  Then

24  MacCarlie's girlfriend, Barbara Adcock, and her three children, Randy, Ryan, and

25  Rachelle moved in, making the trailer very crowded.  This was at least partially due to

26  Hop's serious failures of personal hygiene.  Hop lived on a monthly Supplemental

4

Security Check deposited in his bank account on the first of each month, and which was usually consumed within a day or two, on alcohol for himself and friends.

**Robert "Red Beard" Bond**, his wife Cindy, and their young daughter Crystal lived at the Campground while looking for permanent housing.

**Leafe Dodds** and his then girlfriend Michelle were camped beneath a large walnut tree, some five to six hundred feet from the Campground.  They were to be (and it is believed later were) married at the local Harvest Moon Festival on October 5, 1991.  Leafe Dodds was tried jointly with MacCarlie and Bond, in the second of the three related state trials.  Dodds was acquitted of all charges.

**Robert Fenenbock** lived in the vicinity of Hawkins Bar, and considered the Campground his neighborhood.  He was tried with Sue Hamby and Cherri Frazier in the first state trial.  Fenenbock was convicted of the First Degree Murder of Hop Summar, but was acquitted of conspiracy to commit murder.

**Sue Hamby** lived in a dilapidated trailer she called "Hole in the Wall," in Gray's Flat, roughly a mile east of Hawkins Bar.  She was romantically involved with Tex Lockley in the past.  Hamby was tried in the first state trial and convicted of conspiracy to murder Hop Summar, but was acquitted of murder.

**Cherri Frazier** arrived in Hawkins Bar about a week before the Harvest Festival, to attend the wedding of Leafe Dodds and Michelle.  She camped under the same Walnut tree as Leafe Dodds and Michelle.  Frazier was tried in the first state trial and was convicted of conspiracy to murder Hop Summar, but was acquitted of murder.

**Barbara Adcock** is described in Hop's synopsis, *supra.*  She owned a white Ranchero, which had a significant part in the events of this case.  She was tried in the third state trial, with Anthony "Tex" Lockley.  She was convicted of conspiracy to commit murder, first degree murder with special circumstances, and robbery.  Her murder conviction was reversed on appeal.

5

1   **Anthony "Tex" Lockley** lived in a remote cabin, about forty-five minutes

2   from Hawkins Bar, and drove a red flatbed truck.  He was tried with Barbara Adcock in

3   the third state trial.  He was found guilty of conspiracy to commit murder.

4   **Earnest "Tatoo Earnie" Knapp**, his wife Trena Vader Knapp, and their

5   child lived at the Campground.  All charges against Earnest Knapp were dismissed

6   before trial.

7   **Steven Thayer** camped with Robert "Bert" Jones some one hundred

8   yards from the Campground, closer to the river, upstream from the others at the

9   Campground.  Thayer arrived only a few days before the murder.

10   **Robert "Bert" Jones** had been camped at the site of these events for

11   approximately five weeks.  **Michael "Scarecrow" Roanhouse** lived in a second trailer

12   on Sue Hamby's property. **David Stegner** was the boyfriend of Cherri Frazier and had

13   previously been involved with Sue Hamby.  He drove a truck which he wrecked the

14   night of the murder.

15   **Michael "Black Mike" Sutton** was traveling to the east coast with

16   Gregory "Vito" Bullard and **Cindy "Rotten Cindy" Arends**, in Arends's van.  The three

17   arrived just days before these events.  Sutton had outstanding criminal charges in New

18   York and Texas.

19   **Gregory "Vito" Bullard** is described in Michael Sutton's synopsis, *supra*.

20   Bullard and Sutton claimed, falsely, that they were father and son.  **"Wino Brother"**

21   **Randy** was with a group known as "the Wino Brothers" who were from Eureka.  The

22   "Wino Brothers" did not intend to stay in the Hawkins Bar area and generally only

23   interacted with the rest of these individuals when invited to do so.

24   **Carl Hanks** was the cashier at the BP Mini Mart on the evening of

25   October 2, 1991. **Patsy Brown** and her three children lived with  Sid Smith (who called

26   himself "King of the Mountain," at his residence a little over two miles up the road to

6

1  Denny.  Robert Fenenbock lived on the same property, but at a different residence,

2  called Foggy Bottom.

3        **Randy Hogrefe**, the oldest child of Barbara Adcock (age nine at the time

4  of the murder), was a main witness for the prosecution.  There was substantial litigation

5  at the state level about his competence as a witness, upon grounds which included that

6  he had at first claimed not to have seen anything relevant, but described very significant

7  facts after he was told by a Sheriff's Investigator to pretend that he had seen what

8  happened and then describe it.  **Harry Darr** lived in Cedar Flat.  **Sid Smith** is described

9  in Patsy Brown's synopsis, *supra.*

10      **3)**   **Prelude**

11        A careful effort is made in this report to limit the facts to material either not

12  contested by the parties or actually presented to MacCarlie's jury.  In view of the

13  confusion of multiple seemingly benighted witnesses with disjointed stories, and the

14  technical nature of the claims of this petition, it is essential to focus on *what MacCarlie's*

15  *own jury heard,* rather than the full Ballad of Hawkins Bar.[1]  To that end, rather than

16  adopt the statement of facts given by the California Court of Appeal, which dealt with

17  the facts related to the appeals of multiple defendants in two of the three state cases,

18  the transcripts have been painstakingly panned to find the nuggets pertaining to

19  MacCarlie, heard by his separate jury, untainted by the extraneous words and deeds of

20  his fellow citizens of Hawkins Bar.[2]  The sequence of events related here is perforce

21  disjointed and not without gaps, because different witnesses testified at the three trials,

22

23       [1] The California Court of Appeal consolidated the appeals of MacCarlie, Bond,
24  Adcock and Lockley, resulting in a single statement of facts that not only referenced the
   testimony heard by the MacCarlie/Dodds jury and the Bond jury, but also the testimony
25  heard by the Adcock/Lockley jury.

26       [2] The statement of facts found in respondent's answer frequently cites to the
   transcripts from the two other trials.

and some told different stories at various times.

When Barbara Adcock and her three children moved into Bernard "Bird" MaCCarlie's trailer, where he and Hop Summar lived, Adcock was quickly dissatisfied with Hop's presence.  Soon, she began spreading the story that Hop had sodomized her youngest child, Rachelle, who was five years old.  Although Rachelle was examined by experts, both by interview and physical examination, no credible evidence of molestation was ever developed.

Adcock, nevertheless, began to tell seemingly everyone she encountered that Hop had molested her daughter and that something should be done about it.  It became a common topic of conversation, and talk of vigilante action spread in the community.

The time-line of events immediately leading up to the death of Hop Summar is difficult to reconstruct, because the denizens of Hawkins Bar were not wont to wear watches, and were habitually intoxicated.  A rough sequence is here attempted, using the testimony presented to MacCarlie's jury.

### 4)   <u>October 1, 1991</u>

Robert Jones testified that at the main campsite at the Campground that evening, he was at a get-together with Bernard MacCarlie, Barbara Adcock, Robert Bond, Leafe and Michelle Dodds, Cherri Frazier, Sue Hamby, Steven Thayer, Michael Sutton, Gregory Bullard, Cindy Arends, and others.

Hop Summar's name came up and Frazier said that "the motherfucker should be killed."  Adcock "was pretty much saying exactly the same thing."  Jones did not recall exactly what Bond said, but it was "something like something ought to be done."  Jones opined that Hop "had not done it."  Jones had stated his disbelief in Hop's guilt on several prior occasions.  After Jones expressed this opinion at the get-together, the attitude toward him changed.  People did not want to talk to him and they gave him

"looks." These people included Frazier, MacCarlie, Adcock, Bond, Leafe and Michelle Dodds, and Hamby.

Later, Sutton heard Bond, MacCarlie, and Adcock talking about, "Doing him, doing him tonight, take care of that sucker, etc...". Sutton also had a conversation with Frazier, Adcock, and Hamby, in which Frazier said that Sutton looked like he could take care of himself, and that the women would be much appreciative if he would help them kill Hop. Hamby then asked Adcock, "What do you want me to do with him?" Sutton walked over to Arends and Bullard and told them about the conversation. Bullard told Sutton to stay close and not get involved. Later that evening, Hamby apologized for the earlier conversation, and told Sutton to just not get involved.

Later that same evening Hop entered Simone Legree's Bar, "a little distraught, mad, and it seemed like he had been drinking a little." Hop said that Harry Darr had just tried to get Hop into Darr's pickup truck and had struck Hop, possibly with a pistol. Hop was bleeding from a roughly half inch "deep gash" on the side of his face. One of the bar's patrons cleaned up the cut and used a Band-Aid to cover it. Some time later Michael Roanhouse and Hamby encountered Hop at Simon Legree's. Hop was obviously intoxicated. He left with Hamby and Roanhouse and spent the night in Hamby's trailer.

### 5)   October 2, 1991

#### a.   Prior to The Murder

Steven Thayer testified that on the morning of October second, he woke up, "rolled [his] camp up, and told Jones he was leaving. Jones decided to go with him, and the two walked toward the highway. The two men came across Frazier, who invited them to have a beer with her. The three, along with Leafe and Michelle Dodds, drank beer. David Stegner might have been there as well. During that period, Frazier and Michelle Dodds said they believed that Hop had molested Adcock's daughter and

needed "his ass kicked."  Thayer and Jones expressed their belief that Hop was not guilty.  The group drank beer for two and a half to three hours, during which Thayer probably drank twenty to twenty-five cans of beer.  The group then moved back to Jones' campsite, where Thayer blacked out.

When Thayer came to, he was on his feet, walking through Bond's campsite.  Soon thereafter, Thayer saw MacCarlie, who told him it would be a good idea if he collected his gear and got the hell out of the camp area, specifically Hawkins Bar.  Adcock may have said the same thing.  Thayer testified that he believed he was told to leave because he had expressed his opinion that Hop had not molested Adcock's daughter.

Thayer and Jones packed their belongings and headed out of camp.  On their way, the two were stopped by a car, and MacCarlie and Knapp jumped out.  MacCarlie accused Jones of striking one of the women, and told Thayer and Jones that he was taking them back to the main campsite.  Thayer agreed to go after he saw that MacCarlie had a knife.  Upon reaching the campsite, the four men got out of the vehicle.  Thayer believed he was pushed to the ground by MacCarlie, who also shoved Jones.  After getting to his feet, Thayer left.

Jones' testimony concerning these events was similar to Thayer's.  Jones said that when he awoke on October second, he also decided to leave Hawkins Bar.  While walking around saying goodbye to people, he ran into Michelle Dodds, who told him it was her birthday and who insisted that he drink beer with her.  Jones, Michelle Dodds, Frazier, [Wino Brother] Randy and Thayer drank beer for "a couple of hours."  Jones personally drank a 12-pack of beer and a half jug of wine and the group as a whole consumed three cases of beer and three or four jugs of wine.  When no alcohol remained, the group went back to Jones' camp, where they cooked hamburgers and eggs.  Jones then took a nap.

Two to three hours later Jones was awakened by Thayer, who told him that they had just been told to get out of camp.  Jones walked back to where the group had been drinking to find out why.  There he encountered Michelle Dodds who yelled, "Get the fuck out of here," and threw a rock at him.  On cross-examination Jones acknowledged that Michelle Dodds might have thrown the rock at him because he was accused of stealing food.  On redirect, Jones agreed that it would be truthful to characterize his dispute with Michelle Dodds as involving the fact that Jones disagreed with the group's belief that Hop had committed molestation; the group's belief that Jones had called Adcock a liar; an accusation that Jones had stolen food; and an accusation that Jones had assaulted Michelle Dodds.

Jones headed for the main campsite, but Michelle Dodds ran through a shortcut, arriving before Jones and screaming help me.  Adcock and Frazier joined Michelle Dodds, and confronted Jones.  Frazier pushed Jones and yelled "Get the fuck out of here."  Adcock threatened Jones with a baseball bat.  Jones turned back toward his own camp.

Sutton's testimony about these events was somewhat different, as he testified that Jones was beaten with a stick by Michelle Dodds.  Arends, Hamby, Frazier and Adcock were present and armed.  Adcock had a baseball bat, Arends an axe, and Hamby a .25 caliber pistol.  Sutton believed that Jones was beaten because on the previous day he had commented to certain people that he did not believe that Hop was either capable of, or had done what he was being accused of.  After about ten minutes, Jones left the area.

While walking to his own campsite, Jones encountered  Thayer.  Soon after that, MacCarlie, with Ernie Knapp in the passenger seat, drove a white Ranchero towards Jones and Thayer, nearly running into Jones.  MacCarlie jumped out and attempted to stab Jones a few times.  Jones blocked all but one of MacCarlie's stab

11

attempts.  MacCarlie ordered everybody into the back of the Ranchero, and proceeded to the main campsite.

Arriving at the campsite, Jones saw Bond, Leafe and Michelle Dodds, Adcock, Bullard, Arends, and Frazier.  The group shouted vulgarities, and MacCarlie asked Jones if he knew what kind of frame of mind MacCarlie was in.  Jones responded that it looked like MacCarlie wanted to kill somebody.

Jones saw that Thayer had been pushed down, and then had gone up the hill.  Jones said that it was MacCarlie that pushed Thayer, and that as Thayer was going up the hill, Bond "kicked him in the ass."  That was the last Jones saw of Bond.

MacCarlie then bent Jones over the tailgate of the Ranchero and put a knife to his ear, saying "Ill cut your fucking ear off."  Jones heard shouting from several people, including Frazier, Adcock, and Bond.  Jones then felt the knife blade cut into his neck.  Jones grabbed MacCarlie's hand, which was holding the knife and made a little slice in his own neck.  Jones was then able to stand up and MacCarlie put the knife away.  At some point during the scuffle with MacCarlie, Jones heard someone yell "Hop is in camp."

Around the same time the Jones/Thayer events were occurring at the Campground, Roanhouse was walking to the Hawkins Bar Store, where he encountered Tex Lockley.  The two men drove towards the Campground in  Lockley's red flatbed truck.  At about 6 p.m. they encountered Hop, who jumped in the back of the truck.  The three men proceeded to the Campground.

When Roanhouse, Lockley and Hop arrived at the main campsite, the people present began "hollering 'Get him out of here.'"  In response to the shouts, Lockley backed his truck up and returned to a level spot at the top of the hill.  There the three men encountered Bond and Fenenbock, who both punched Hop in the head.  According to the prosecution, Roanhouse told Sargent Kartchner that the men accused

1   Hop of being a child molester, to which he replied "I'm not guilty, I'm not guilty."

2   Roanhouse testified however that he could not recall making that statement.

3         Thayer, who was now making his way out of the Campground, came

4   across Roanhouse and Hop in the pickup truck at the top of the hill.  Thayer testified

5   that there was a third person seated in the truck, but he did not see who it was.

6   Roanhouse meanwhile got a can of beer and some tobacco from Lockley, and began

7   walking down the road toward the main campsite at the Campground.

8         Again, Sutton's testimony was somewhat different, as he testified that he

9   saw MacCarlie drive the Ranchero out of the main campsite up towards the top of the

10   hill with Bond in the passenger seat.  Sutton "couldn't be certain" but believed Adcock's

11   youngest child, Randy Hogrefe, was in the back of the vehicle.  Roanhouse testified that

12   while he was walking down towards the campsite he was passed by MacCarlie, who

13   was driving the Ranchero up towards the top of the hill.

14         When the Ranchero arrived at the top of the hill, Thayer's belongings were

15   in the back.  Thayer removed his belongings and did not see anyone in the back of the

16   vehicle.  Thayer overheard Hop Summar say:

17
18
> Hey, man, I didn't do it, you know.  You
> know, what are you going to do?  Kill me
> and throw me in the bushes?

19   MacCarlie responded, "Something like that, yeah."  Harry Darr may have been present

20   at that time, and may have told Thayer it would be a good idea for Thayer to leave.

21         Thayer left the Campground and began hitchhiking on Highway 299.

22   After ten to fifteen minutes of hitchhiking, he saw the Ranchero come off the dirt road

23   that leads to the Campground, turn onto the highway, and travel in the same direction

24   that he was hitchhiking.  Bond was driving the Ranchero, with MacCarlie in the

25   passenger seat and with Hop Summar sitting between them.  Fifteen to twenty minutes

26   later, Jones caught up to Thayer, and told Thayer that he had been stabbed.

1    Meanwhile, down at the main campsite, Roanhouse, Hamby, and Trena

2    Vader Knapp had decided to go pick up a grill for a barbeque.  The three departed in

3    Hamby's truck.  As they passed the spot where Roanhouse had left Hop, Bond,

4    Lockley, Fenenbock and the truck, the truck and all the men were gone.

5    Jones saw Hamby's truck leave the Campground while he was hitchhiking.

6    In fact it was the only vehicle he saw leaving the Campground.  Jones and Thayer

7    eventually caught a ride to the town of Willow Creek, where they called the police.

8    Officers responded, and Jones told them he was concerned for Hop's safety.  Jones

9    was taken to a hospital by ambulance, and later to the Eureka Police Department,

10   where he discussed these events with law enforcement.  Thayer  rode in a patrol car

11   back to the Campground to look for Hop.

12   Meanwhile, after hunting for the grill for about an hour and twenty minutes,

13   Roanhouse, Hamby, and Trena Knapp returned to the Campground somewhere

14   between 7:30 p.m. and 8:00 p.m., finding Tattoo Ernie Knapp, Randy (the Wino

15   Brother), Barbara Adcock, and her three children.  The group barbequed and ate dinner.

16   According to Roanhouse, Adcock's son, Randy Hogrefe, did not seem to be upset

17   during this time.  Approximately two hours later, Roanhouse saw that Lockley was at the

18   campsite.  Bond, Fenenbock, and MacCarlie were not at the main campsite during the

19   barbeque, or for several hours after.

20   After an argument between Stegner and Frazier, Stegner drove his truck

21   from the Campground toward the Highway and wrecked it.  The wreck occurred

22   approximately forty-five minutes after Roanhouse observed that Lockley was in the

23   campsite.  Prior to the accident Stegner had done "a lot of drinking and a lot of drugs."

24   Roanhouse, who acknowledged that he too "pretty much drank alcohol throughout the

25   day" and was intoxicated, watched emergency personnel, law enforcement and a tow

26   truck arrive before walking home.

### b.   The Murder

At MacCarlie's trial, only two people, Randy Hogrefe and Bernard MacCarlie, testified about the actual events of Hop's murder.  Their  testimony differed significantly.

### i.   Randy Hogrefe

Randy Hogrefe, who was nine years old at the time of the murder, testified that when Lockley drove his truck into the campground with Hop Summar in the back, Hogrefe's mother, Barbara Adcock had "a bunch of us kids get into the bathroom for some reason."  While he was in the bathroom, Hogrefe heard yelling.

The next thing Randy remembered was getting into the Ranchero to go to sleep.  In the bed of the Ranchero was a mattress and some blankets.  The next thing that Randy remembered was the Ranchero driving towards "some mountains" with Bond, Fenenbock, MacCarlie, Leafe Dodds and Hop.  After traveling a "bumpy zig-zag road" the Ranchero arrived at a "timber place."  At the timber place the four men stabbed Hop.

Hogrefe heard Hop yelling and screaming while he was being stabbed. Hogrefe thought that all four  men had knives but did not "remember very well."  Randy also heard a police siren and someone say, "The cops are coming, the cops are coming."  After stabbing Hop, the four men drug him over to a stump.

The men then got back in the Ranchero and traveled to the home of Sid Smith.  Bond and Leafe Dodds however, "got out somewhere" prior to Smith's house. Hogrefe knew it was Smith's home because the road is bumpy and because he recognized the sound of Smith's dog barking.  According to Hogrefe, MacCarlie then left Smith's and drove the Ranchero back to the scene of the murder and then to the BP gas station, where he discovered Hogrefe.

/////

1    Hogrefe testified that when he was discovered by MacCarlie he "started

2    running" but eventually "came back."  MacCarlie then took off his own shoes and put

3    them in a trash can.  Although the BP was closed, Randy testified that MacCarlie was

4    let in and bought beer and a sucker for Hogrefe.  The two then traveled in the Ranchero

5    back to the Campground but "were backed up" by police officers.  Randy then fell

6    asleep.

7    On cross-examination Randy was questioned about the people who were

8    "helping him remember," as well as some possible contradictory statements he had

9    made.  Randy testified that sometime after these events he was driven to the log

10   landing and told that was the spot that Hop's body was found.  Defense counsel

11   suggested that Hogrefe previously stated that he had never been to that spot prior to

12   being told that it was where Hop's body was found.

13   Hogrefe also testified that it was police officers who told him MacCarlie

14   had taken his shoes off and put them in the garbage can.  The Respondent

15   acknowledges that "[i]t would be idle to pretend that [Hogrefe's] story was entirely

16   consistent."  Indeed, Sergeant Kartchner testified that Hogrefe at one point said that he

17   had made the whole story up.

18                    **ii.   Bernard MacCarlie**

19   MacCarlie testified that the Jones/Thayer incident occurred because

20   Michelle Dodds told MacCarlie that Jones had kicked her in the stomach.  After

21   MacCarlie "came back out" from having "snapped" on Jones, he heard voices saying

22   that Hop was at the top of the hill.  MacCarlie drove the Ranchero up the hill to talk to

23   Hop about the molestation allegations.  MacCarlie did not see Hogrefe in the Ranchero.

24   When MacCarlie reached the top of the hill, Hop was alone.  MacCarlie denied ever

25   telling Hop he was going to kill him.

26   /////

1    MacCarlie and Hop "ended up at the log landing."  According to

2   MacCarlie, once at the log landing:

> It's weird how this happened, okay.  I was sitting in the truck.
> While I'm sitting in this truck, I'm also up in this tree and I'm
> watching.  I'm looking down at this scene at the log landing
> where this guy is sitting in this truck.  I didn't know it was me
> at the time.  And he's sitting there, and all of a sudden he
> just backhands three times in this guy's chest area.  And I'm
> like - - as I'm watching this the next thing I know he
> backhands him two or three times with his fist.  It's like I'm
> watching a scene out of a movie and I'm like whoa.
>
> The guy gets out of the truck, runs around the other side,
> grabs this guy, pulls him out, throws him up on the bank.  He
> rolls down a little bit.  This guy kicks him a couple of times to
> turn him over.  Then he just goes off and starts stabbing him
> everywhere.
>
> After whatever amount of time it took, the guy stops, and he
> looks up like this.  And he was looking around the forest, and
> I noticed it's me, and I just freaked out.

13   MacCarlie denied ever hearing Adcock say that Hop, "should be killed" or that they,

14   "ought to do him," and he never heard anyone say, "are you in on it or not."  With

15   respect to the whereabouts of Bond and Leafe Dodds during Hop's murder, MacCarlie

16   testified:

> Q.    Did you - - did you see Leafe Dodds and Bob Bond
>        help anybody drag this body aside by the tree?
>
> A.    I hadn't seen Leafe all (sic).
>
> Q.    From the tree?
>
> A.    At all, period.  At the campground at all.  Bob Bond
>        was not there, either.  I had met Bob one night or one
>        day, as a matter of fact.
> Q.    So - -
>
>        THE COURT: Let me interrupt.  When you say not
> there, not where?  You say Bob Bond was not there?
>
>        THE WITNESS: Well, he asked me if I seen him drag
> or pull or - - and he was not there dragging or pulling
> anybody.

1    THE COURT: When you say "there," you are talking about the log landing?

2    THE WITNESS: Right.

3    THE COURT: I just didn't know whether it was the campground or what.

4    

5    [PROSECUTOR]: Thank you.  I wanted to clarify that.

6    Q.  You meant you didn't see him there in the picture from the tree at the log landing dragging Hop?

7    A.  No, I did not see Bond or Dodds.

8    Q.  Okay.  You are not suggesting to this jury that they weren't there, you just didn't see them there?

9    

10   A.  I did not see them.

11   MacCarlie left the log landing and returned to the Campground.

12   Sometime later he decided to go to Sid Smith's house.  Hogrefe got permission from

13   Adcock to go with MacCarlie.  Bond and Fenenbock accompanied them.

14                **c.    After The murder**

15   According to Patsy Brown, who was living with Sid Smith at the time, on

16   the evening of the October second, at roughly 8 p.m. Brown heard her dog barking and

17   noticed the Ranchero pulling up.  Bond and Fenenbock "jumped out of the back.

18   MacCarlie testified that after leaving Smith's, MacCarlie and Hogrefe went

19   to the BP station where MacCarlie attempted to buy cigarettes and beer but was turned

20   away by the cashier because the store was closed.  Carl Hanks, the cashier at the BP

21   Mini Mart on the evening of October second, 1991, testified that shortly after 9:00 p.m.

22   that evening MacCarlie walked up to the store's entrance wearing blue jeans and no

23   shirt.  Hanks told MacCarlie the store was closed, and MacCarlie left.  MacCarlie

24   testified that he and Hogrefe headed back to the Campground but the road was blocked

25   because of Stegner's accident.

26   /////

1    Meanwhile, at about 10:00 p.m., Sergeant Kartchner responded to the

2 report that Hop Summar was missing.  After exploring other locations, Kartchner arrived

3 at the top of the hill and saw the white Ranchero.  Behind where the Ranchero was

4 parked Kartchner saw some blood, a necklace, a large clump of hair and a Band-Aid.

5 While Kartchner was photographing the Ranchero, Hogrefe's "head popped up."

6 Hogrefe looked at Kartchner and "went right back down and covered up with the blanket

7 again."

8    After photographing the Ranchero Kartchner spoke with MacCarlie, who

9 was sitting in the driver's seat.  Kartchner noticed that MacCarlie had a "fresh cut" on his

10 finger that looked "extremely clean, like it had just been washed."  Kartchner also

11 noticed that there was a knife sheath on MacCarlie's belt, but no knife, and that

12 MacCarlie was not wearing any footwear.                    After the roadway was cleared

13 Kartchner went down to the Campground.  While Kartchner was interviewing and

14 photographing those present at the Campground he saw Bond "come slide into the

15 camp from one of the trails."  Bond was not wearing any footwear, but was wearing the

16 same clothes as he was wearing when Kartchner encountered him at the Cabin.

17 Kartchner did not see any knife or a knife sheath on Bond.  Kartchner briefly talked with

18 Bond and had him photographed.

19         **6)**   **October 3, 1991**

20    Michael Sutton testified that back at the Campground that morning  he

21 saw Hamby take Hop's backpack out of Lockley's truck, remove money from it and put

22 the backpack in her truck.  Back at Hamby's home, Roanhouse saw her wiping the

23 backpack off with a wet cloth.  Hamby turned the backpack over to Deputy Litts later

24 that afternoon.

25 /////

26 /////

### 7)   **The Body**

On October sixth, 1991, Hop's decomposing body was discovered at a logging site off Highway 299.  A knife was found on a log about 50-75 feet from the body.  The knife was covered in what would later be identified as Hop Summar's blood.

An autopsy revealed that Hop died from over seventy stab wounds and bludgeoning.  His body had been horrifically beaten, his left ear removed while he was alive,  and his left eye gouged out.

### 8)   **Miscellaneous Forensic Evidence**

The investigation into Hop Summar's murder began almost immediately after Jones reported his concerns, and continued for sometime after Hop's body was discovered.  Early on Lockley's red truck was ordered seized after a sheriff's deputy noticed blood stains on the vehicle.  Tests revealed stains consistent with Hop's blood type.  Also submitted for examination were pants belonging to Lockley.  Blood consistent with Hop's was found on those pants.

A wallet and a broken mirror belonging to MacCarlie were examined as well.  Tests revealed human blood on those items consistent with either Hop Summar's or Ernie Knapp's.

With respect to Bond, two sets of personal effects were examined.  The first consisted of  "white socks, underpants, a blue t-shirt, pants, Levi's and tennis shoes."  The second  consisted of denim pants, a long sleeve shirt, a Bic lighter, a leather belt, a metal belt buckle, and a blue velcro wallet.  No blood was found on any of these items.

The Ranchero was also examined, and no human blood was detected.

## B.   **State Courts**

Nine persons, Robert Bond, Bernard MacCarlie, Leafe Dodds, Robert Fenenbock, Ernest Knapp, Anthony Lockley, Barbara Adcock, Cherri Frazier, and Sue

1  Hamby were charged in December of 1991 and October of 1992 with various crimes

2  relating primarily to the death of Gary Hop Summar.  There were extensive and

3  voluminous pretrial proceedings.  Ultimately all charges as to Ernest Knapp were

4  dismissed.  The remaining eight persons were tried in three separate cases in two

5  different counties.  With the exception of Dodds, all were convicted of various offenses,

6  and the post-trial proceedings were eventually concluded.

7        **C.**    **Federal Court**

8        MacCarlie's federal habeas corpus proceeding has been pending for a

9  decade, consumed by the vast state record, the five related federal cases pending in

10  this Court, and overwhelming procedural issues.  These included numerous defense

11  motions, a stay for state exhaustion proceedings, two amended petitions, a motion to

12  dismiss and a response.  On September 9, 2005, Magistrate Judge Dale A. Drozd held

13  a hearing, resulting in a lengthy report and recommendation resolving complex

14  procedural matters, particularly the respondent's motion to dismiss, involving circuitous

15  issues concerning the timeliness of multiple claims.  Judge Drozd's comprehensive

16  report of September 11, 2006, was adopted by Senior United States District Judge

17  Lawrence K. Karlton on July 6, 2007.  The Court having resolved the  labyrinthine

18  procedural questions, MacCarlie was given time to file a second amended petition

19  raising the four claims remaining in the case.

20        On May 15, 2009, MacCarlie filed a second amended petition.

21  Respondent filed an answer on July 10, 2009, and MacCarlie filed his traverse on

22  September 11, 2009.  This matter is therefore ready for resolution.

23  **IV.**    **APPLICABLE STANDARD OF HABEAS CORPUS REVIEW**

24        An application for a writ of habeas corpus by a person in custody under a

25  judgment of a state court can be granted only for violations of the Constitution or laws of

26  the United States.  28 U.S.C. § 2254(a).

1    Federal habeas corpus relief is not available for any claim decided on the

2   merits in state court proceedings unless the state court's adjudication of the claim:

3           (1) resulted in a decision that was contrary to, or involved an
            unreasonable application of, clearly established federal law,
4           as determined by the Supreme Court of the United States; or

5           (2) resulted in a decision that was based on an
            unreasonable determination of the facts in light of the
6           evidence presented in the State court proceeding.

7   28 U.S.C. § 2254(d).

8           Although "AEDPA does not require a federal habeas court to adopt any

9   one methodology," Lockyer v. Andrade, 538 U.S 63, 71 (2003), there are certain

10   principles which guide its application.

11           First, the "contrary to" and "unreasonable application" clauses are

12   different.  As the Supreme Court has explained:

13           A federal habeas court may issue the writ under the
            "contrary to" clause if the state court applies a rule different
14           from the governing law set forth in our cases, or if it decides
            a case differently than we have done on a set of materially
15           indistinguishable facts.  The court may grant relief under the
            "unreasonable application" clause if the state court correctly
16           identifies the governing legal principle from our decisions but
            unreasonably applies it to the facts of the particular case.
17           The focus of the latter inquiry is on whether the state court's
            application of clearly established federal law is objectively
18           unreasonable, and we stressed in Williams [v. Taylor, 529
            U.S. 362 (2000)] that an unreasonable application is different
19           from an incorrect one.

20   Bell v. Cone, 535 U.S. 685, 694 (2002).  It is the habeas petitioner's burden to show the

21   state court's decision was either contrary to or an unreasonable application of federal

22   law.  Woodford v. Visciotti, 537 U.S. 19, 123 S. Ct. 357, 360 (2002).  It is appropriate to

23   look to lower court decisions to determine what law has been "clearly established" by

24   the Supreme Court and the reasonableness of a particular application of that law.  See

25   Duhaime v. Ducharme, 200 F.3d 597, 598 (9th Cir. 2000).

26   /////

22

Second, the court looks to the last reasoned state court decision as the basis for the state court judgment.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002). So long as the state court adjudicated petitioner's claims on the merits, its decision is entitled to deference, no matter how brief.  Lockyer, 538 U.S. at 76; Downs v. Hoyt, 232 F.3d 1031, 1035 (9th Cir. 2000).  Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under section 2254(d).  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.2003); Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir.2002).  When it is clear that a state court has not reached the merits of a petitioner's claim, or has denied the claim on procedural grounds, the AEDPA's deferential standard does not apply and a federal habeas court must review the claim de novo. Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir.2003).

Third, in determining whether a state court decision is entitled to deference, it is not necessary for the state court to cite or even be aware of the controlling federal authorities "so long as neither the reasoning nor the result of the state-court decision contradicts them."  Early v. Packer,  537  U.S. 3, 8 (2003). Moreover, a state court opinion need not contain "a formulary statement" of federal law, so long as the fair import of its conclusion is consonant with federal law.  Id.

## V.     DISCUSSION OF PETITIONER'S CLAIMS

### A.     Intent to Kill Jury Instruction

#### 1)     Description of Claim

Under California law a conviction for conspiracy to commit murder requires a finding of specific intent and therefore cannot be based on the implied malice theory of second degree murder.  When instructing MacCarlie's jury on the murder charge the trial the judge gave instructions that included discussion of the implied malice theory.  The trial judge however failed to instruct the jury that implied malice was

1   only applicable to the charge of murder and was not applicable to the charge of

2   conspiracy to commit murder.  MacCarlie argues that this error altered a crucial element

3   of the crime of conspiracy by allowing the jury to convict him without finding he

4   possessed the required specific intent.  Second Amended Petition at 18.

5   **2)      State Court Opinion**

6           The California Court of Appeal acknowledged the instructional error, but

7   found it harmless, stating:

8               Reference to the implied malice theory of second degree
               murder in the instructions, without any limitation to the
9               murder charges alone, violated the rule stated in <u>Swain</u>,[3] that
               a conviction of conspiracy to commit murder requires a
10              finding of intent to kill, and cannot be based on a theory of
               implied malice.  We do not find that prejudicial error was
11              committed, however, under the governing harmless beyond
               a reasonable doubt standard for misinstruction on the
12              elements of an offense.

13                                      * * *

14              The principles of implied malice second degree murder were
               erroneously articulated to the MacCarlie jury without
15              explanation, since <u>Swain</u> mandates that a conviction of
               conspiracy to commit first degree murder "cannot be based
16              on a theory of implied malice."  But again, argument in the
               case was limited to express malice, in contrast to <u>Swain</u>,
17              where the court emphasized that the "prosecutor repeatedly
               referred to implied malice in the closing arguments, stating at
18              one point that '. . . this could very easily be an implied malice
               case.' " Although reference to the definition of implied malice
19              was briefly made, the murder instructions otherwise focused
               exclusively and at great length on express malice and intent
20              to kill.  The conspiracy instruction explicitly informed the jury
               that specific intent to commit *murder* must accompany the
21              agreement, and as our high court has repeatedly observed: "
               ' [I]t is impossible to intend to commit a murder without
22              intending to kill.' " Any possible confusion that may have
               accompanied the cursory reference to implied malice in the
23              murder instructions was thus ameliorated by the express
               requirement of intent to commit murder in the conspiracy

24

25          _____

26          [3] In <u>People v. Swain</u>, the California Supreme Court held that a conviction of
       conspiracy to commit murder requires a finding of intent to kill, and cannot be based on
       a theory of implied malice.  <u>People v. Swain</u>, 12 Cal.4th 593, 607 (Cal. 1996).

1
2
3
4
5

> instructions.  Finally, while the jury rendered a general
> verdict and did not convict MacCarlie of the underlying
> murder charge, the evidence, particularly the prior
> discussion of the conspirators and the manner in which the
> victim was killed, compellingly establishes intent to kill.
> Accordingly, we are convinced beyond a reasonable doubt
> that inclusion of the reference to implied malice in the
> murder instructions in the MacCarlie case did not result in
> jury misunderstanding or contribute to the guilty verdict on
> the conspiracy charge.

6  /////

7  Opinion at 19-21 (citations omitted) (footnotes omitted).

8  **3)    Applicable Law**

9  "The fact that a jury instruction violates state law is not, by itself, a basis

10  for federal habeas corpus relief." Clark v. Brown, 450 F.3d 898, 904 (9th Cir. 2006).  In

11  general, a challenge to jury instructions alone does not state a federal constitutional

12  claim. See Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v.

13  Isaac, 456 U.S. 107, 119 (1982)); Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir.

14  1983).  In order to warrant federal habeas relief, a challenged jury instruction "cannot be

15  merely 'undesirable, erroneous, or even "universally condemned," ' but must violate

16  some due process right guaranteed by the fourteenth amendment." Prantil v. California,

17  843 F.2d 314, 317 (9th Cir. 1988) (quoting Cupp v. Naughten, 414 U.S. 141, 146

18  (1973)).

19  To prevail on such a claim petitioner must demonstrate "that an erroneous

20  instruction 'so infected the entire trial that the resulting conviction violates due process.'

21  " Prantil v. State of Cal., 843 F.2d 314, 317 (9th Cir. 1988) (quoting Darnell v. Swinney,

22  823 F.2d 299, 301 (9th Cir. 1987)).  The challenged jury instruction must be reviewed "

23  'in the context of the overall charge to the jury as a component of the entire trial

24  process.' " Id. (quoting Bashor v. Risley, 730 F.2d 1228, 1239 (9th Cir. 1984)).  Further,

25  in reviewing an allegedly ambiguous instruction, the court "must inquire 'whether there

26  is a reasonable likelihood that the jury has applied the challenged instruction in a way'

25

1  that violates the Constitution." Estelle v. McGuire, 502 U.S. 62, 72 (1991) (quoting

2  Boyde v. California, 494 U.S. 370, 380 (1990)).

3      **4)    Discussion**

4          The California Court of Appeal concluded that the trial court's reference to

5  the implied malice theory of second degree murder, without limitation, was a violation of

6  state law and an error.  Opinion at 19.  Nevertheless, that court found the error was not

7  prejudicial because, in part, the reference to implied malice was "cursory" and the

8  totality of the instructions adequately explained the express malice and intent to kill

9  requirements.  Id. at 20-21.

10         In order to grant habeas relief where a state court has determined that a

11  constitutional error was harmless, a reviewing court must determine: (1) that the state

12  court's decision was "contrary to" or an "unreasonable application" of Supreme Court

13  harmless error precedent, and (2) that the petitioner suffered prejudice from the

14  constitutional error, as that term is defined in Brecht v. Abrahamson, 507 U.S. 619

15  (1993).  Mitchell v. Esparza, 540 U.S. 12, 17-18 (2003); Inthavong v. LaMarque, 420

16  F.3d 1055, 1059 (9th Cir. 2005).  See also Fry v. Pliler, 551 U.S. 112, 121-22 (2007) ("in

17  § 2254 proceedings a federal court must assess the prejudicial impact of constitutional

18  error in a state-court criminal trial under the 'substantial and injurious effect' standard

19  set forth in Brecht, 507 U.S. 619, whether or not the state appellate court recognized the

20  error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt'

21  standard set forth in Chapman [v. California], 386 U.S. 18").  Both of these tests must

22  be satisfied before relief can be granted and, because both must be satisfied, a court

23  need not address them in any particular order.  Inthavong, 420 F.3d at 1061.

24          Harmless error determinations are highly fact-specific.  They
            often involve a review of the entire trial record.  Under
25          Brecht, we will often make numerous independent
            evaluations about the weight and sufficiency of the various
26          items of evidence, the inferences to be drawn, and the

26

1
2
3

> different theories of the case.  Under AEDPA, we simply
> concern ourselves with the reasonableness of the
> evaluations and conclusions that the state court explicitly or
> implicitly made, although requiring the state court to meet
> the more stringent 'beyond a reasonable doubt' standard.

4  Id. at 1060.  Moreover, a determination about what is reasonable is not conclusive; if the

5  state court's evaluation is also reasonable, petitioner is not entitled to habeas relief

6  under the AEDPA. Kessee v. Mendoza-Powers, 574 F.3d 675, 676 (9th Cir. 2009).

7        MacCarlie's jury was instructed that:

8
9
10

> In the crimes changed in Count 1, murder; Count 2,
> conspiracy to commit murder; Count 3, robbery, and the
> special allegations of great bodily injury, there must exist a
> certain *specific intent* in the mind of the perpetrator.  Unless
> such *specific intent* exists, the crime to which it relates is not
> committed.

11
12

> The *specific intent* required is included in the definition of the
> crime set forth elsewhere in these instructions.

13  Reporter's Transcripts ("RT") at 6080 (emphasis added).

14  The jury was further instructed to consider evidence relating to MacCarlie's "mental

15  effect" only:

16
17
18
19

> [F]or the purpose of determining whether Defendant
> MacCarlie actually formed the required *specific intent*,
> premeditated, deliberated or harbored malice aforethought,
> which is an element of the crime charged, to wit, murder in
> Count 1, and conspiracy to commit murder in Count 2 or the
> lesser crime of second degree murder.

20  Id. at 6081.

21  Finally, the trial judge instructed the jury on the specific elements of conspiracy, stating:

22
23
24
25

> A conspiracy is an agreement entered into between two or
> more persons with the *specific intent* to agree to commit the
> offense of murder and with the further *specific intent* to
> commit such offense followed by an overt act committed in
> this state by one or more of the parties for the purpose of
> accomplishing the object of the agreement.  Conspiracy is a
> crime.

26

> In order to find a defendant guilty of conspiracy, in addition

27

1
       to the proof of the unlawful agreement and the *specific*
*intent*, there must be proof of the commission of at least one
2
       of the overt acts alleged in the Information.

3  Id. at 6083.

4         After issuing these instructions, the trial judge proceeded to issue the

5  murder instructions which did discuss the implied malice theory of second degree

6  murder.  Id. at 6092.  Though it was an error under California law for the trial judge to

7  issue that instruction without a limiting explanation there is nothing apparent from the

8  instructions that indicates the jury disregarded the specific instructions pertaining to the

9  charge of conspiracy, specifically the necessary finding that MacCarlie possessed the

10  "specific intent to agree to commit the offense of murder."  There is no evidence that the

11  jury misunderstood the instructions and the jury is presumed to have followed the

12  instructions given.  See Weeks v. Angelone, 528 U.S. 225, 234 (2000); (the jury is

13  presumed to follow the jury instructions); United States v. Reed, 147 F.3d 1178, 1180

14  (9th Cir. 1998) (same).

15         The California Court of Appeal's conclusion that the jury instruction error

16  was harmless is neither contrary to, nor an unreasonable application of, clearly

17  established constitutional law and MacCarlie is not entitled to relief on this claim.

18  /////

19  **B.**    **Ex Post Facto**

20      **1)**    **Description of Claim**

21         MacCarlie argued on appeal that the trial court's failure to instruct on

22  lesser included offenses was an error.  Second Amended Petition at 23.  In rejecting

23  this claim, the California Court of Appeal cited People v. Cortez, which held that all

24  conspiracies to commit murder are conspiracies to commit first degree murder.  Cortez

25  was decided after MacCarlie's conviction.  MacCarlie argues that the use of Cortez to

26  reject his claim violated due process and the prohibition on ex post facto laws.  Id. at 25.

1

### 2) **Applicable Law**

2   The United States Constitution provides that "No State shall ... pass any
3   ... ex post facto Law." U.S. CONST. art. I, § 10.  See also Himes v. Thompson, 336 F.3d
4   848, 854 (9th Cir. 2003).  A law violates the Ex Post Facto Clause of the United States
5   Constitution if it: (1) punishes as criminal an act that was not criminal when it was
6   committed; (2) makes a crime's punishment greater than when the crime was
7   committed; or (3) deprives a person of a defense available at the time the crime was
8   committed.  See Collins v. Youngblood, 497 U.S. 37, 52 (1990).  The Ex Post Facto
9   Clause "is aimed at laws that retroactively alter the definition of crimes or increase the
10  punishment for criminal acts."  Himes, 336 F.3d at 854 (quoting Souch v. Schaivo, 289
11  F.3d 616, 620 (9th Cir. 2002)).  See also Cal. Dep't of Corr. v. Morales, 514 U.S. 499,
12  504 (1995).  "An unforeseeable judicial enlargement of a criminal statute, applied
13  retroactively, operates precisely like an ex post facto law."  Bouie v. City of Columbia,
14  378 U.S. 347, 353 (1964).  Therefore, "[i]f a judicial construction of a criminal statute is
15  'unexpected and indefensible by reference to the law which had been expressed prior to
16  the conduct in issue,' it must not be given retroactive effect."  Id. at 353-54. (quoting
17  Hall, *General Principles of Criminal Law* (2d ed.1960), at 61.)  When an unforeseeable
18  state-court construction of a criminal statute is applied retroactively to subject a person
19  to criminal liability for past conduct, "the effect is to deprive him of due process of law in
20  the sense of fair warning that his contemplated conduct constitutes a crime." Id. at 354-
21  55.  See also Marks v. United States, 430 U.S. 188, 191 (1977) ("persons have a [due
22  process] right to fair warning of that conduct which will give rise to criminal penalties").

### 3) **Discussion**

24   MacCarlie argues that at the time of his commitment offense, "the law
25  provided that acts committed by him combined with the mens rea possessed by him
26  under the evidence, could constitute the crimes of conspiracy to commit first degree

murder, second degree murder, or manslaughter." Traverse at 15. MacCarlie argues that he was prejudiced because, "[b]y the time MacCarlie's appeal in this case was decided the only offense of which he could be convicted for the acts and mens rea shown by evidence in his case, was the most serious of those offenses which carried considerably longer punishment than the other two." Id.

It appears from MacCarlie's argument that he concedes there was sufficient evidence to support the jury's finding that he was guilty of conspiracy to commit first degree murder. Nevertheless, MacCarlie's own argument demonstrates that he was not prejudiced by Cortez.

Prior to Cortez, as MacCarlie points out, MacCarlie could have been found guilty of conspiracy to commit second degree murder or manslaughter. MacCarlie thus would have been subject to a range of lesser punishments had the jury not found sufficient proof of his guilt for a conviction of conspiracy to commit first degree murder. Cortez thus set a higher standard for conviction on a charge of conspiracy to commit murder by specifically requiring proof of intent to commit premeditated and deliberated first degree murder.

Unfortunately for MacCarlie, the prosecution was able to convince the jury that he was guilty of conspiracy to commit first degree murder. MacCarlie however was subject to the same punishment for that crime prior to the Cortez ruling. Moreover, the defense that he only participated in a conspiracy to commit second degree murder or manslaughter was available to him at the time of his trial and is still available after Cortez. Indeed, not only is that defense still applicable to a charge of conspiracy to commit murder, but after Cortez, that defense would be a complete defense to conviction as oppose to merely an argument for conviction on a lesser offense.

The California Court of Appeal's use of Cortez was not a violation of due process or the prohibition on ex post facto laws and MacCarlie is not entitled to relief on

30

1 this claim.

2 **C.**    **Ineffective Assistance of Counsel**

3      **1)**    **Description of Claim**

4      MacCarlie argues that he received ineffective assistance of counsel

5 because his trial counsel failed to request jury instructions on the lesser included

6 offenses of conspiracy to commit second degree murder or conspiracy to commit

7 manslaughter.  Second Amended Petition at 35; Traverse at 16.  MacCarlie argues that

8 this failure deprived him of the defenses applicable to those lesser offenses.  Second

9 Amended Petition at 25.

10      **2)**    **Applicable Law**

11      The Sixth Amendment guarantees the effective assistance of counsel.

12 The United States Supreme Court set forth the test for demonstrating ineffective

13 assistance of counsel in Strickland v. Washington, 466 U.S. 668 (1984).  To support a

14 claim of ineffective assistance of counsel, a petitioner must first show that, considering

15 all the circumstances, counsel's performance fell below an objective standard of

16 reasonableness.  Id. at 687-88.  After a petitioner identifies the acts or omissions that

17 are alleged not to have been the result of reasonable professional judgment, the court

18 must determine whether, in light of all the circumstances, the identified acts or

19 omissions were outside the wide range of professionally competent assistance.  Id. at

20 690; Wiggins v. Smith, 539 U.S. 510, 521 (2003).

21      Second, a petitioner must establish that he was prejudiced by counsel's

22 deficient performance.  Strickland, 466 U.S. at 693-94.  Prejudice is found where "there

23 is a reasonable probability that, but for counsel's unprofessional errors, the result of the

24 proceeding would have been different."  Id. at 694.  A reasonable probability is "a

25 probability sufficient to undermine confidence in the outcome."  Id.  See also Williams,

26 529 U.S. at 391-92; Laboa v. Calderon, 224 F.3d 972, 981 (9th Cir. 2000).  A reviewing

31

1  court "need not determine whether counsel's performance was deficient before

2  examining the prejudice suffered by the defendant as a result of the alleged

3  deficiencies.... If it is easier to dispose of an ineffectiveness claim on the ground of lack

4  of sufficient prejudice ... that course should be followed." Pizzuto v. Arave, 280 F.3d

5  949, 955 (9th Cir. 2002) (quoting Strickland, 466 U.S. at 697).

6  In assessing an ineffective assistance of counsel claim "[t]here is a strong

7  presumption that counsel's performance falls within the 'wide range of professional

8  assistance.' " Kimmelman v. Morrison, 477 U.S. 365, 381 (1986) (quoting Strickland,

9  466 U.S. at 689).  There is in addition a strong presumption that counsel "exercised

10  acceptable professional judgment in all significant decisions made." Hughes v. Borg,

11  898 F.2d 695, 702 (9th Cir. 1990) (citing Strickland, 466 U.S. at 689).  Ineffective

12  assistance of counsel claims are analyzed under the "unreasonable application" prong

13  of Williams v. Taylor, 529 U.S. 362 (2000).  Weighall v. Middle, 215 F.3d 1058, 1062

14  (9th Cir. 2000).

15  **3)   Discussion**

16  MacCarlie has failed to meet either prong of the Strickland test.  The

17  entirety of his argument, found only in his Second Amended Petition, consists of one

18  paragraph.  Other than asserting that his trial counsel "was not aware she should have"

19  requested these instructions, MacCarlie makes no attempt to establish that her

20  performance was deficient.  Moreover, MacCarlie's argument is entirely devoid of any

21  reference to the prejudice prong of Strickland.

22  MacCarlie has failed to show that his trial counsel's performance was

23  deficient or that he was prejudiced by her performance, and he is not entitled to relief on

24  this claim.

25  /////

26  /////

1

### D.   Heat of Passion Instruction

2

### 1)   Description of Claim

3

MacCarlie argues that the trial court's refusal to issue a "heat of passion"

4

jury instruction was an error.[4]  Second Amended Petition at 27.  MacCarlie argues that

5

as a result of the court's refusal, he "was deprived of the jury's determination whether

6

heat of passion reduced the conspiracy to one to commit voluntary manslaughter."  Id.

7

/////

8

### 2)   State Court Opinion

9

The California Court of Appeal rejected this claim, stating:

10

Nothing in the record supports a voluntary manslaughter
instruction based upon heat of passion.  The dubious

11

accusations of molestation which had been made against
Hop, even if believed by MacCarlie, were not fresh.

12

MacCarlie had known for almost a week that Hop was
suspected by Adcock of molesting Rachelle. Thereafter, for

13

days MacCarlie repeatedly discussed plans to harm or kill
Hop.  He did not act on impulse.  The appearance of Hop in

14

the campground was not an event so disturbing or traumatic
that it may have disturbed the reason and aroused the

15

passions of a reasonable man.  Moreover, even if we
consider only the defense evidence that MacCarlie did not

16

recall any plot to kill Hop, he testified that he proceeded to
the top of the hill when Hop arrived only to "talk about this

17

molest allegation, see if we could straighten it out."  If so, he
was not then provoked, and nothing that happened at the top

18

of the hill constitutes adequate provocation.  After the
assault at the top of the hill, Hop was taken by MacCarlie

19

and the others to a remote log landing where the fatal attack
was finished. The only inference to be drawn from the

20

evidence is that the killing of Hop was a planned deed
committed for revenge or punishment, not a spontaneous act

21

of passion.  Finally, MacCarlie was convicted only of the
conspiracy offense, and we have concluded that no offense

22

23

    [4] MacCarlie titles this claim "MACCARLIE'S CONVICTION FOR CONSPIRACY TO COMMIT

24

MURDER VIOLATES DUE PROCESS AND THE PROHIBITION ON EX POST FACTO LAWS BECAUSE
THE STATE COURT OF APPEAL USED CORTEZ AS A BASIS TO REJECT MACCARLIE'S

25

CONTENTION ON APPEAL THAT THE TRIAL COURT ERRED IN REFUSING TO INSTRUCT THE JURY
ON 'HEAT OF PASSION.' " Second Amended Petition at 26.  The California Court of

26

Appeal's opinion however does not explicitly reference Cortez on this issue, nor does
MacCarlie's argument.

1   of conspiracy to commit voluntary manslaughter exists.
    Hence, the lack of an instruction on voluntary manslaughter
2   could not have been prejudicial to him.

3   Opinion at 30 (citations omitted).

4   ### 3)   Applicable Law And Discussion

5   MacCarlie acknowledges that the California Court of Appeal rejected his

6   argument because under California law there is no crime of conspiracy to commit

7   voluntary manslaughter and because that court found no evidentiary basis for issuing

8   the instruction.  Second Amended Petition at 27.

9   Federal courts are bound by a state appellate court's determination that

10  an instruction was not warranted under state law.  See Bradshaw v. Richey, 546 U.S.

11  74,76 (2005) (per curiam) (noting that the Supreme Court has repeatedly held that "a

12  state court's interpretation of state law, including one announced on direct appeal of the

13  challenged conviction, binds a federal court sitting in habeas corpus."); Murtishaw v.

14  Woodford, 255 F.3d 926, 956 (9th Cir. 2001) (deference must be given to a state

15  supreme court's interpretation of state law governing a jury instruction), cert. denied,

16  535 U.S. 935 (2002).

17  Further, "[n]ormally jury instructions in State trials are matters of State

18  law."  Hallowell v. Keve, 555 F.2d 103, 106 (3rd Cir. 1977) (citation omitted); see also

19  Williams v. Calderon, 52 F.3d 1465, 1480-81 (9th Cir. 1995), cert. denied, 516 U.S.

20  1124 (1996).  An instructional error "does not alone raise a ground cognizable in a

21  federal habeas proceeding."  Dunckhurst v. Deeds, 859 F.2d 110, 114 (9th Cir. 1988)

22  (citation omitted); see also Van Pilon v. Reed, 799 F.2d 1332, 1342 (9th Cir. 1986)

23  (claims that merely challenge correctness of jury instructions under state law cannot

24  reasonably be construed to allege a deprivation of federal rights) (citation omitted).  A

25  claim that a state court violated a federal habeas petitioner's due process rights by

26  omitting a jury instruction requires a showing that the error so infected the entire trial

34

that the resulting conviction violated due process.  Henderson v. Kibbe, 431 U.S. 145, 155 (1977); Menendez v. Terhune, 422 F.3d 1012, 1029 (9th Cir. 2005); see also Estelle, 502 U.S. at 72 (discussing due process standard).  In cases in which a petitioner alleges that the failure to give an instruction violated due process, his burden is "especially heavy," because "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law."  Henderson, 431 U.S. at 155.  Here, MacCarlie fails to meet this heavy burden.

First, there is no clearly established federal law that requires a state trial court to give a lesser included offense instruction as would entitle MacCarlie to relief. See 28 U.S.C. § 2254(d) (1); Beck v. Alabama, 447 U.S. 625, 638 & n. 7 (1980) (holding that failure to instruct on lesser included offense in a *capital* case is constitutional error if there was evidence to support the instruction but expressly reserving "whether the Due Process Clause would require the giving of such instructions in a non-capital case"); Solis v. Garcia, 219 F.3d 922, 929 (9th Cir. 2000) (per curiam) (in non-capital case, failure of state court to instruct on lesser included offense does not alone present a federal constitutional question cognizable in a federal habeas corpus proceeding), cert. denied, 534 U.S. 839; Windham v. Merkle, 163 F.3d 1092, 1106 (9th Cir. 1998) (failure of state trial court to instruct on lesser included offenses in non-capital case does not present federal constitutional question), cert. denied, 541 U.S. 950 (2004).  Accordingly, to the extent MacCarlie's argument is solely predicated upon the trial court's failure to give a lesser included offense instruction, this claim is not cognizable on federal habeas review and should be denied on that basis.

Second, although "the defendant's right to adequate jury instructions on his or her theory of the case might, in some cases, constitute an exception to the [foregoing] general rule," Solis, 219 F.3d at 929, MacCarlie's was not such a case.  See Clark v. Brown, 450 F.3d 898, 904 (9th Cir. 2006) (state court's jury instructions violate

1  due process if they deny the criminal defendant "a meaningful opportunity to present a

2  complete defense"), <u>cert</u>. denied <u>by</u>, <u>Ayers v. Clark</u>, 549 U.S. 1027 (2006) (quoting

3  <u>California v. Trombetta</u>, 467 U.S. 479, 485 (1984)).

4       The California Court of Appeal found that nothing in the record

5  supported a voluntary manslaughter instruction based upon a "heat of passion" defense.

6  On federal habeas review, "a determination of a factual issue made by a State court

7  shall be presumed to be correct" unless rebutted by the petitioner by clear and

8  convincing evidence.  28 U.S .C. § 2254(e)(1).  <u>See</u> <u>also</u> <u>Schriro v. Landrigan</u>, 550 U.S.

9  465, 473-74 (2007) ("AEDPA also requires federal habeas courts to presume the

10 correctness of state courts' factual findings unless applicants rebut this presumption

11 with 'clear and convincing evidence.' ") (citing Section 2254(e) (1)); <u>Pollard v. Galaza</u>,

12 290 F.3d 1030, 1033, 1035 (9th Cir. 2002) (statutory presumption of correctness applies

13 to findings by both trial courts and appellate courts); <u>Dubria v. Smith</u>, 224 F.3d 995,

14 1000 (9th Cir. 2000) (<em>en banc</em>).

15      "Clear and convincing evidence" within the meaning of § 2254(e) "requires

16 greater proof than preponderance of the evidence" and must produce "an abiding

17 conviction" that the factual contentions being advanced are "highly probable." <u>Cooper v.</u>

18 <u>Brown</u>, 510 F.3d 870, 919 (9th Cir. 2007) (quoting <u>Sophanthavong v. Palmateer</u>, 378

19 F.3d 859, 866 (9th Cir. 2004)).

20      MacCarlie disputes the California Court of Appeal's finding and argues

21 that there was sufficient evidence to support the instruction.  Second Amended Petition

22 at 22-23.  MacCarlie does not however explain how his own testimony, which was cited

23 by the California Court of Appeal, that he killed Hop not in a fit of rage but during an out

24 of body experience, was consistent with a heat of passion defense.  <u>See</u> RT at 5184-85.

25 Regardless, MacCarlie has not provided "clear and convincing" evidence to rebut the

26 finding by the California Court of Appeal that there was insufficient evidence to support

the instruction.

The state court's rejection of this claim was neither contrary to, nor an unreasonable application of, clearly established constitutional law and MacCarlie is not entitled to relief on this claim.

### E.     Jury Verdict

#### 1)     Description of Claim

While MacCarlie's jury was deliberating, one juror became seriously ill. RT at 6163.  At that time, the jury had reached verdicts as to several counts and, over the objections of both the prosecution and the defense, the trial judge recorded the jury's partial verdicts.  Id. at 6175-85.  The seriously ill juror was then replaced with an alternate juror and the reconstituted jury commenced deliberations on the remaining undecided count of murder.  Id. at 6185-89.  After deliberating for sometime, the reconstituted jury was unable to reach a verdict on the murder count and a mistrial was declared.  Id. at 257-58.

MacCarlie argues that by taking partial verdicts, discharging the seriously ill juror, and then continuing deliberations with an alternate, the trial court violated his "federal constitutional rights to trial by jury and to proof beyond a reasonable doubt of all material facts and elements of the crimes charged."  Second Amended Petition at 32. MacCarlie goes on to argue that he was deprived of his right to juror unanimity as required by the California Constitution.  Id.

#### 2)     State Court Opinion

The California Court of Appeal rejected this claim, stating:

> We find no error in the acceptance of partial verdicts under the circumstances presented in the case before us.  Where, as here, the jury has reached partial verdicts before substitution of a juror, the approved procedure is to accept the verdicts already rendered and advise the reconstituted jury, as the trial court did, to disregard prior deliberations on the remaining charges and begin deliberations anew.

1
2
3
4
5
6

> Substitution of an alternate juror after submission of the case to the jury and partial verdicts have been
> rendered does not offend constitutional proscriptions so long as the reconstituted jury is instructed to start deliberations anew.  There exists no authority that "holds the reconstituted jury must reconsider the verdicts already returned or deliberate on factual conclusions irrelevant to the counts yet to be decided."  Further, the requirement of juror unanimity was not abridged, at least not to the detriment of MacCarlie, as the only guilty verdicts rendered by the jury occurred *before* substitution of the alternate. The acceptance of partial verdicts was not an abuse of the trial court's discretion.

7  /////

8  Opinion at 44 (citations omitted) (emphasis in original).

9        **3)    Applicable Law And Discussion**

10        AEDPA "requires federal habeas courts to deny relief that is contingent

11  upon a rule of law not clearly established at the time the state court conviction became

12  final."  Williams v. Taylor, 529 U.S. 362, 380 (2000).  The "clearly established" phrase

13  "refers to the holdings, as opposed to the dicta, of [United States Supreme Court]

14  decisions as of the time of the relevant state-court decision."  Lockyer v. Andrade, 538

15  U.S. 63, 71-72 (2003) (quoting Williams, 529 U.S. at 412.  In other words, "clearly

16  established Federal law" under § 2254(d)(1) is the governing legal principle or principles

17  set forth by the Supreme Court at the time the state court renders its decision.  See id.

18  MacCarlie fails to cite any Supreme Court holding that finds accepting a partial verdict in

19  a criminal trial per se violated the federal constitution.

20        Moreover, to the extent MacCarlie is arguing that the trial judge's actions

21  violated California law, the Supreme Court has "repeatedly held that a state court's

22  interpretation of state law, including one announced on direct appeal of the challenged

23  conviction, binds a federal court sitting in habeas corpus."  Bradshaw v. Richey, 546

24  U.S. 74, 76 (2005).

25        To the extent MacCarlie is arguing the trial judge's action's violated

26  Federal law, the only federal authority MacCarlie cites is Hicks v. Oklahoma, 447 U.S.

343 (1980), which he cites in support of his argument that he suffered the depravation of a "state-created right to jury unanimity." Second Amended Petition at 31. It is apparent however, that the trial judge's actions did not conflict with MacCarlie's "state-created right to jury unanimity." See People v. Thomas, 218 Cal. App.3d 1477 (1990) (trial court did not abuse its discretion when it received the jury's partial verdict knowing that one of the jurors later would be excused from the panel for good cause.); People v. Aikens, 207 Cal.App.3d 209 (1988) (Trial court did not commit reversible error in substituting a juror after verdict had been reached on one of two charged counts.).

The state court's rejection of this claim therefore was neither contrary to, nor an unreasonable application of, clearly established constitutional law and MacCarlie is not entitled to relief on this claim.

## F.  Cumulative Error

### 1)  Description of Claim

MacCarlie argues that the "accumulation of prejudice from all of the grounds for relief raised in this second amended petition warrants relief for MacCarlie even if any single error, standing alone, does not." Second Amended Petition at 32.

### 2)  Applicable Law And Discussion

In cases where there are a number of trial errors, the court may look at "the overall effect of all the errors in the context of the evidence introduced at trial against the defendant." United States v. Frederick, 78 F.3d 1370, 1381 (9th Cir. 1996) (quoting United States v. Wallace, 848 F.2d 1464, 1476 (9th Cir. 1988)). "In other words, 'errors that might not be so prejudicial as to amount to a deprivation of due process when considered alone, may cumulatively produce a trial setting that is fundamentally unfair.'" Alcala v. Woodford, 334 F.3d 862, 883 (9th Cir. 2003) (quoting Thomas v. Hubbard, 273 F.3d 1164, 1180 (9th Cir. 2001)).

/////

1       However, "where there is no single constitutional error existing, nothing

2 can accumulate to the level of a constitutional violation." <u>Fuller v. Roe</u>, 182 F.3d 699,

3 704 (9th Cir. 1999), <u>overruled</u> <u>on</u> <u>other</u> <u>grounds</u> <u>by</u> <u>Slack v. McDaniel</u>, 529 U.S. 473

4 (2000).  Here, there was no single error committed and therefore there was no

5 cumulative error.  MacCarlie thus is not entitled to relief on this claim.

6 **VI.**    <u>**CONCLUSION**</u>

7       Accordingly, IT IS RECOMMENDED that petitioner's petition for a writ of

8 habeas corpus be denied.

9       These findings and recommendations are submitted to the United States

10 District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).

11 Within twenty-one days after being served with these findings and recommendations,

12 any party may file written objections with the court and serve a copy on all parties.

13 Such a document should be captioned "Objections to Magistrate Judge's Findings and

14 Recommendations."  Any reply to the objections shall be served and filed within seven

15 days after service of the objections.  Failure to file objections within the specified time

16 may waive the right to appeal the District Court's order. <u>Turner v. Duncan</u>, 158 F.3d

17 449, 455 (9th Cir. 1998); <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).  In any

18 objections he elects to file petitioner may address whether a certificate of appealability

19 should issue in the event he elects to file an appeal from the judgment in this case. <u>See</u>

20 Rule 11, Federal Rules Governing Section 2254 Cases (the district court must issue or

21 deny a certificate of appealability when it enters a final order adverse to the applicant).

22 DATED: May 20, 2010

23

24               CHARLENE H. SORRENTINO
                   UNITED STATES MAGISTRATE JUDGE

25

26